AO 106 (Rev. 06/09)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Southern District of California



2019 AUG -9  A 10: 27

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

Forensic Images of Subject Media 11, Subject Media 12, and Subject Media 14

Case No.

**'19MJ10288**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____Southern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 641, 287, 371, 1001, 1341, and/or 1343 | Theft of Public Money or Property; Making or Presenting a False, Fictitious, or Fraudulent Claim; Conspiracy to commit offense or to defraud the United States; False Statements; Mail Fraud and/or Wire Fraud |

The application is based on these facts:
See Affidavit of Special Agent Alejandro Arroyave, which is hereby incorporated by reference and made part hereof.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Alejandro Arroyave, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: ___8/9/19___

_____
*Judge's signature*

City and state: El Centro, CA

Ruth Bermudez Montenegro, U.S. Magistrate Judge
*Printed name and title*

## ATTACHMENT A

## ITEMS TO BE SEARCHED

The property to be searched are the forensic images of the following:

**SUBJECT MEDIA 11**
Acer Desktop Computer
Model: Aspire TC-710-UR64
Serial Number: DTB15AA023630036E73000

**SUBJECT MEDIA 12**
Acer Desktop Computer
Model: Aspire TC-710-UR64
Serial Number: DTB15AA023630036BE3000

**SUBJECT MEDIA 14**
Hewlett Packard Desktop Computer
Model: 750-427c
Serial Number: 4CE6361DXQ

(collectively, the **REMAINING SUBJECT MEDIA**).

The forensic images of the **REMAINING SUBJECT MEDIA** are in the possession of the United States Department of Homeland Security (DHS), Office of Inspector General (OIG) located at 516 Industry Way, Suite B, Imperial, CA, 92251.

## ATTACHMENT B

## ITEMS TO BE SEARCHED AND SEIZED

The items to be searched and seized are evidence, fruits, and/or instrumentalities of violations of federal law including violations of Title 18, United States Code, Sections 641 (Theft of Public Money or Property), 287 (Making or Presenting a False, Fictitious, or Fraudulent Claim), 371 (Conspiracy to commit offense or to defraud the United States), 1001 (False Statements), 1341(Mail Fraud), and/or 1343 (Wire Fraud). These crimes relate to the theft of federal grant funds from Operation Stonegarden in and around the County of Imperial, California by Chief of Police Fred R. Beltran (CHIEF BELTRAN), Sergeant Freddie M. Beltran (SGT BELTRAN), and other unknown conspirators, for the time period August 12, 2014, through June 30, 2017, whereby the criminal conduct involved the submission of false Daily Activity Reports (DARs) to the Imperial County Sheriff's Office (ICSO) for the purpose of receiving overtime reimbursement from Operation Stonegarden funds. The evidence to be searched and seized is limited to the following:

Electronic records, mail, messages, attachments, images, or data on the forensic images of the **REMAINING SUBJECT MEDIA**:

    (1)    discussing or tending to discuss or relating or tending to relate to Operation Stonegarden, including but not limited to compliance with or knowledge of Operation Stonegarden grant guidelines and/or the policies and procedures outlined in the written agreements between the Westmoreland Police Department and the Imperial County Sheriff's Office;

    (2)    discussing or tending to discuss or relating or tending to relate to hours or shifts that were claimed or submitted for overtime reimbursement from Operation Stonegarden but were not actually worked, including but not limited discussing or tending to discuss or relating or tending to relate to "ghost hours";

    (3)    constituting, discussing, establishing, or tending to constitute, discuss or establish fraudulent or false activity with respect to Operation Stonegarden reimbursement submissions;

1

    (4)    relating or tending to relate to Operation Stonegarden, including draft and final versions of Daily Activity Reports (DARs) and/or other documents created or maintained by the Westmoreland Police Department in connection with Operation Stonegarden;

    (5)    constituting, discussing, establishing, or tending to constitute, discuss, or establish the work schedule or work activities of Westmoreland Police Department officers during Operation Stonegarden overtime shifts, including but not limited to data establishing when and/or where officers were logged into or otherwise using the **REMAINING SUBJECT MEDIA**;

    (6)    relating to Spillman queries or other law enforcement queries of individuals and/or vehicles;

    (7)    identifying or tending to identify other participants in the crimes above;

    (8)    tending to place in context, identify the creator or recipient of, or establish the timeline of any of the information above, including data reflecting who used or controlled the **REMAINING SUBJECT MEDIA** at or around the time that data reflecting criminal activity within the scope of the affidavit was created, accessed, deleted, modified, copied, downloaded, uploaded, or printed.  Such data includes registry information, computer logs, user profiles and passwords, web-browsing history, cookies, electronic mail stored on the computer or device, electronic address books, calendars, instant messaging logs, electronically-stored photographs and video, file structure and user-created documents, including metadata.

The seizure and search of the forensic images of the **REMAINING SUBJECT MEDIA** shall follow the procedures outlined in the supporting affidavit. Deleted data, remnant data, slack space, and temporary and permanent files on the forensic images of the **REMAINING SUBJECT MEDIA** may be searched for the evidence above.



## **AFFIDAVIT**

1    I, ALEJANDRO ARROYAVE, United States Department of Homeland Security
2  (DHS), Office of Inspector General (OIG) Special Agent, having been duly sworn,
3  depose and state as follows:

### **INTRODUCTION**

**A.    Training and Experience**

7    1.    I am a Special Agent with DHS OIG and have been so employed since
8  May 2004.  DHS OIG is tasked with the responsibility of investigating, arresting, and
9  prosecuting individuals suspected of committing federal or state violations having a
10 nexus to any DHS employee or program.

11   2.    I am a Federal Law Enforcement Officer within the meaning of Rule 41(b)
12 of the Federal Rules of Criminal Procedure, that is, a government agent engaged in the
13 enforcement of the criminal laws of the United States, and thereby authorized to request
14 issuance of federal search and seizure warrants.  As such, I am empowered to conduct
15 investigations of and to make arrests for federal offenses.  I also am an "investigative
16 or law enforcement officer of the United States" within the meaning of Title 18, United
17 States Code, Section 2510(7).

18   3.    As a Special Agent with DHS OIG, my primary duties include the
19 investigation of allegations of criminal misconduct by any DHS employee or contractor
20 having a nexus to any DHS program or employee.  In the course of my duties, I conduct
21 investigations ranging from narcotics trafficking, human trafficking, civil rights
22 abuses, grant or program fraud, money laundering, and other criminal activities not
23 statutorily reserved for specific federal agencies.  During my tenure as a Special Agent
24 with DHS OIG, I have worked as a case agent, directing financial crimes and corruption
25 investigations; (2) surveilled and recorded movements of individuals suspected of
26 financial crimes or corruption; (3) participated in the execution of search warrants
27 related to financial crimes or corruption investigations; (4) initiated and executed
28 numerous arrests for financial- or corruption-related offenses; and, (5) interviewed

- 1 -

criminal defendants, witnesses, and informants in furtherance of investigations into financial crimes or corruption. I also am certified as a Certified Fraud Examiner by the Association of Certified Fraud Examiners.

4.      My experience, along with my training and my conversations with other DHS OIG Agents, all form the basis for the opinions and conclusions set out in this affidavit. In addition, the information contained in this affidavit is based upon review of various official reports, and my personal observations and knowledge. Conversations and discussions below are set forth in substance unless noted. Dates and times are approximate.

**B.      Purpose of This Affidavit**

5.      I am the case agent assigned to the investigation of officers of the Westmorland, California Police Department (WPD), including Chief of Police Fred R. Beltran (CHIEF BELTRAN) and Sergeant Fred M. Beltran (SGT BELTRAN), relating to false claims for overtime payments in connection with a federal grant known as Operation Stonegarden (Stonegarden). I was the affiant to the probable cause statement supporting the applications for search and seizure warrants for (1) Lenovo Desktop Computer (Serial Number: R300HGBK) (**SUBJECT MEDIA 1**); (2) Lenovo Desktop Computer (Serial Number: R300HGEF) (**SUBJECT MEDIA 2**); (3) Dell Desktop Computer (Serial Number: 5681275922) (**SUBJECT MEDIA 3**); (4) Motorola MW810 Mobile Workstation (Serial Number: 736SJU0821) (**SUBJECT MEDIA 4**); (5) Seagate External Drive (Serial Number: NA8J6TX8) (**SUBJECT MEDIA 5**); (6) Western Digital External Drive (Serial Number: WCC4E5UJ0JHA0) (**SUBJECT MEDIA 6**); (7) Western Digital External Drive (Serial Number: WXE1A47JJPX5) (**SUBJECT MEDIA 7**); (8) Apple Laptop Computer (Serial Number: C02TXQWWHV29) (**SUBJECT MEDIA 8**); (9) Motorola MW810 Mobile Workstation (Serial Number: 736SHU0837) (**SUBJECT MEDIA 9**); (10) Motorola MW810 Mobile Workstation (Serial Number: 736SHU0818) (**SUBJECT MEDIA 10**); (11) Acer Desktop Computer (Serial Number: DTB15AA023630036E73000)

- 2 -

(**SUBJECT MEDIA 11**); (12) Acer Desktop Computer (Serial Number: DTB15AA023630036BE3000) (**SUBJECT MEDIA 12**); (13) Motorola MW810 Mobile Workstation (Serial Number: 736SHU0819) (**SUBJECT MEDIA 13**); and, (14) Hewlett Packard Desktop Computer (Serial Number: 4CE6361DXQ) (**SUBJECT MEDIA 14**) (collectively the **SUBJECT MEDIA**).

6.   **SUBJECT MEDIA 1** through **8** were forensically imaged by the United States Department of Homeland Security (DHS), Office of Inspector General (OIG) pursuant to signed, written consent of the WPD to image and analyze the contents of the WPD's computers, as discussed further below. **SUBJECT MEDIA 9** and **10** also were forensically imaged by DHS OIG after I secured sealed search warrants for **SUBJECT MEDIA 1** through **14**, signed by the Honorable Peter C. Lewis on August 20, 2018. *See* Case Nos. 18-MJ-10045 through 18-MJ-10058. After **SUBJECT MEDIA 9** and **10** were imaged – but before they were searched by me or any other law enforcement officials – a decision was made to add additional details to the Affidavit submitted in connection with the search warrants for the **SUBJECT MEDIA**.

7.   On October 9, 2018, federal search warrant 18-MJ-10856 was sworn before the Honorable Ruth Montenegro, authorizing the search of the **SUBJECT MEDIA** (the Prior Warrant). The Prior Warrant specifically authorized agents to create a forensic image (i.e., an exact physical copy) of the **SUBJECT MEDIA**. **SUBJECT MEDIA 11** through **14** were seized from the WPD and forensic images were made. **SUBJECT MEDIA 11** through **14** were then returned to the WPD. **SUBJECT MEDIA 1** through **10** were not re-imaged in reliance on the signed authorization and search warrants.

8.   The Prior Warrant further authorized agents to identify and extract data within the scope of the Prior Warrant from all of the **SUBJECT MEDIA** within 120 days of seizure. On February 12, 2019, the court authorized an extension of the search, allowing the continuing examination of the forensic images of the **SUBJECT MEDIA**

through April 9, 2019. Review of the forensic images of **SUBJECT MEDIA 1** through **11** and **SUBJECT MEDIA 13** was completed prior to the April 9, 2019, deadline.

9.      Unfortunately, due to the sheer size of the data, the reviewing team was unable to complete the review of the forensic images of **SUBJECT MEDIA 11** through **12** and **SUBJECT MEDIA 14** (collectively, the **REMAINING SUBJECT MEDIA**) prior to the April 9, 2019, deadline. Prior to April 9, 2019, the initial review of the forensic images of the **REMAINING SUBJECT MEDIA** was completed and revealed over 1,000,000 different items or files of interest. By using keyword and date-specific searches, the reviewing team narrowed the items or files of interest down to several thousand files that contain data that appears to be related to the subject matter of the Prior Warrant. For example, the review revealed a large number of Excel files related to the Daily Activity Reports (DARs) that were required to be submitted for Stonegarden overtime shifts. Many of the DARs contain information I believe to be false. The initial review also revealed that someone at the WPD installed and ran a program called CCleaner, which is designed to permanently erase deleted files, in December 2016. Further review is needed to attempt to pinpoint specific details regarding the installation and running of this program, as well as to search the metadata of the DAR files, which I believe will provide additional evidence of knowing and willful violations of federal law, including laws relating to false claims. Additional review is also needed to further narrow the several thousand files that contain data that appears to be related to the Prior Warrant.

10.      Prior to the April 9, 2019, deadline, I requested a second extension from the United States Attorney's Office (USAO). The paperwork was prepared and submitted to the El Centro USAO. However, due to a misunderstanding on my part, I did not sign the paperwork before leaving on extended training and leave and so the extension request was not timely submitted. I only learned of the misunderstanding upon returning on June 5, 2019.

11.    Forensic technicians and the reviewing team have not searched the forensic images of the **REMAINING SUBJECT MEDIA** since April 8, 2019.

12.    I make this affidavit in support of an application for a follow-on search warrant to narrow the items or files of interest contained on the forensic images of the **REMAINING SUBJECT MEDIA** to that related to the subject matter of the Prior Warrant.  The forensic images of the **REMAINING SUBJECT MEDIA** are further described in Attachment A (incorporated herein by reference).

13.    To be clear, all of the **REMAINING SUBJECT MEDIA** has been returned to the WPD, and the **REMAINING SUBJECT MEDIA** does not need to be re-seized from the WPD in order for the reviewing team to complete its work.  Instead, by this follow-on search warrant, I only seek authority to search and seize the items or files of interest contained on the forensic images of the **REMAINING SUBJECT MEDIA** that relate to the subject matter of the Prior Warrant.  The forensic images are in the custody of DHS-OIG at 516 Industry Way, Suite B, Imperial, CA, 92251.

14.    Given the sheer volume of data, agents request an additional 90 days to search and seize responsive data from the forensic images of the **REMAINING SUBJECT MEDIA**.

## PROBABLE CAUSE

15.    As outlined in the Prior Warrant, I have probable cause to believe that WPD employees, specifically CHIEF BELTRAN and SGT BELTRAN, were filing false claims for overtime payments in connection with a federal grant known as Operation Stonegarden.  CHIEF BELTRAN's and SGT BELTRAN's employment with the WPD terminated in May and June 2017, respectively, after allegations related to their work in connection with the Stonegarden grant became public.

16.    Stonegarden is a federal grant that falls under the Homeland Security Grant Program (HSGP).  Stonegarden provides federal funding for overtime and related expenses to certain state, local, and tribal law enforcement agencies in order to

coordinate law enforcement efforts, primarily along the United States border. Stonegarden funds are paid according to FEMA and U.S. Customs and Border Protection (CBP), Office of Border Patrol (Border Patrol) program guidance and federal grant requirements.

17.     The WPD receives Stonegarden funds through a written agreement between the WPD and the Imperial County Sheriff's Office (ICSO), the WPD's Stonegarden grant manager.  The agreement contains, among other things, the policies and procedures relating to the expenditure of Stonegarden funds in Imperial County. On August 12, 2014, the WPD entered into an agreement with the ICSO to receive federal Stonegarden funds.  CHIEF BELTRAN signed the agreement on behalf of the WPD and renewed the agreement on June 23, 2015, and August 11, 2016 (collectively, the Agreements).

18.     The Agreements required the WPD to submit Daily Activity Reports (DARs) for Stonegarden overtime shifts to the ICSO and the USBP.  The ICSO was then responsible for reimbursing the WPD for the overtime shifts from Stonegarden funds.

19.     The DAR is a standardized form that requests the following information:

    i.    Operation Identifiers

        a.    Agency Name

        b.    USBP Patrol Area

        c.    Operation Site

        d.    Date and Hours of Shift Worked

    ii.    Labor Costs

        a.    Name of Officer

        b.    Overtime Hours

        c.    Overtime Rate

    iii.    Mileage Costs

        a.    Vehicle, Make, Model

b.    Mileage Start

c.    Mileage End

iv.    Equipment Maintenance Costs

v.    Equipment Purchased

vi.    Other Authorized Expenses

vii.    Narrative

viii.    Instances of Operational Activities

ix.    Narcotics Seizure Details

x.    Gang Encounters

xi.    Review & Certification

xii.    A free text field (the WPD reported encounters with people and vehicles in this field)

20.    In December 2017 and April 2018, I interviewed three WPD police officers, two current and one former. One of the officers stated that CHIEF BELTRAN "banked" names during his regular shift in order to be able to claim that he encountered the individuals during the Stonegarden overtime shifts, which he would not work at all or would work only a portion of. He would do this by, at times, driving to agricultural fields during his regular shift and writing down the license plate numbers of vehicles parked along the fields. CHIEF BELTRAN would then falsely claim that he had encountered the vehicles during a Stonegarden overtime shift. CHIEF BELTRAN also would use names of "known individuals" and falsely claim that he had encountered them during Stonegarden overtime shifts. Another officer also stated that CHIEF BELTRAN and SGT BELTRAN submitted "ghost hours" for reimbursement from Stonegarden funds, that is, hours or shifts that they were not actually working. That same officer stated that CHIEF BELTRAN would sometimes log into the Spillman system (a law enforcement database described below) to give the appearance that he was working during the Stonegarden overtime shifts when, in fact, he was either at his house or at SGT BELTRAN's house.

21.    Two of the officers also stated that they observed CHIEF BELTRAN and SGT BELTRAN shredding documents prior to leaving the WPD.  One officer also saw CHIEF BELTRAN deleting files from his computer and SGT BELTRAN also deleting files from CHIEF BELTRAN's computer.  From my training and experience, I know that computer users are often unable to permanently delete files from a computer and that the data may be recovered.  Additionally, certain data on computers, such as automated data created by the computer, is often overlooked during manual deletion by individuals or not able to be readily deleted.

22.    Besides interviewing individuals, I also obtained copies of the DARs submitted by the WPD between January 2015 and March 2017 in order to investigate the CC's claims.  I requested the DARs from the WPD, USBP, and ICSO.  The DARs I received generally contained, among other information, (1) the name of the individual allegedly encountered during the Stonegarden overtime shift and (2) biographical identifiers, such as date of birth or driver's license number.  Additionally, when a vehicle was involved, generally either the license plate number or the vehicle's identification number (VIN) was recorded.  The DARs generally also often identified the location where the encounters occurred.

23.    I also reviewed data from a system known as the Spillman system (Spillman).  Spillman interfaces with law enforcement databases, providing real-time access to an individual's or vehicle's criminal justice information (i.e. warrants, tickets, criminal history, etc.).  Between 2015 and 2017, the WPD accessed Spillman directly through (1) Mobile Data Terminals that are mounted in the WPD's patrol vehicles or through (2) the WPD's desktop or laptop computers.  The WPD could also access Spillman by contacting the Brawley Police Department (BPD) dispatch center and asking them to run the query.  The BPD dispatch center is responsible for dispatching calls for the WPD.

24.    Spillman users are assigned a unique identifier.  Accordingly, I reviewed Spillman data associated with the following identifiers affiliated with the WPD between August 2014 and March 2017 (when the allegations arose):

      i.    W850 – Fred R. Beltran

      ii.   W852 – Eladio Reyes

      iii.  W853 – Luis Aguilar

      iv.  W854 – Freddie M. Beltran

      v.   W856 – Alfonso Martinez

      vi.  W857 – Maximus Barabino

I also reviewed Spillman data associated with identifiers B933 through B940, affiliated with the BPD dispatch center between January 2015 and March 2017.

25.    In 2015, approximately 187 Spillman queries associated with individuals/vehicles allegedly encountered during a Stonegarden shift (as reflected on the submitted DARs) were conducted *before* the Stonegarden overtime shift began.  Of those, approximately 151 of the pre-Stonegarden shift queries were conducted by CHIEF BELTRAN, and approximately 33 were conducted by SGT BELTRAN.  Additionally, approximately 92 Spillman queries associated with individuals/vehicles allegedly encountered during a Stonegarden shift (as reflected on the submitted DARs) were conducted *after* the Stonegarden overtime shift ended.  Of those, approximately 5 were conducted by CHIEF BELTRAN, and approximately 75 were conducted by SGT BELTRAN.  According to time sheets I received from the WPD, CHIEF BELTRAN generally reported working Stonegarden shifts *after* his regular shift.  Conversely, SGT BELTRAN generally reported working Stonegarden shifts *before* his regular shift.

26.    In 2016, the WPD worked approximately 189 Stonegarden overtime shifts, claiming a total of approximately $22,756.05 in overtime payments from Stonegarden funds.  CHIEF BELTRAN worked approximately 64 of the 189

Stonegarden overtime shifts and was paid approximately $9,994.94. SGT BELTRAN worked approximately 62 of the shifts and was paid approximately $6,906.00.

27. Data from the Spillman system for 2016 indicates that, as in 2015, a number of Spillman queries associated with individuals/vehicles allegedly encountered during a Stonegarden shift (as reflected on the submitted DARs) were conducted *before* the Stonegarden overtime shift began. Of the approximately 123 pre-Stonegarden shift queries, approximately 118 were conducted by CHIEF BELTRAN, and approximately 2 were conducted by SGT BELTRAN. Additionally, as in 2015, a number of Spillman queries associated with individuals/vehicles allegedly encountered during a Stonegarden shift (as reflected on the submitted DARs) were conducted *after* the Stonegarden overtime shift ended. Approximately 128 were conducted *after* the Stonegarden overtime shift ended. Of those, approximately 7 were conducted by CHIEF BELTRAN, and approximately 119 were conducted by SGT BELTRAN.

28. Similarly, in 2017 (January through March 31), approximately 22 Spillman queries associated with individuals/vehicles allegedly encountered during a Stonegarden shift (as reflected on the submitted DARs) were conducted *before* the Stonegarden overtime shift began. Of those, approximately 7 were conducted by CHIEF BELTRAN and approximately 12 were conducted by SGT BELTRAN. There also were approximately 37 Spillman queries associated with individuals/vehicles allegedly encountered during a Stonegarden shift (as reflected on the submitted DARs) conducted *after* the STONEGARDEN overtime shift ended. All were conducted by SGT BELTRAN.

29. In comparing the Spillman data to the DARs, I also deemed other queries to be questionable. For example, Spillman queries for different individuals/vehicles were sometimes run mere minutes apart, but the Spillman text field where the officer identified the location of the individual and/or vehicle encountered would require more than a few minutes to travel to, let alone the time to encounter the individual and/or vehicle so that the next query could be run. For example, SGT BELTRAN claimed

1   that he encountered four different individuals at four different locations on January 3,
2   2016.   The Spillman queries for those encounters, however, indicate that they all
3   occurred in less than a four-minute time period even though the locations of the alleged
4   encounters were far apart enough that the distances could not be covered in the
5   timeframe during which the queries were conducted, nor could an encounter with each
6   individual take place.   Of the approximately 225 queries that appeared to me to be
7   questionable in 2015, approximately 100 were run by CHIEF BELTRAN and
8   approximately 111 were run by SGT BELTRAN. All of the approximately 169 queries
9   that appeared to me to be questionable in 2016 were run by CHIEF BELTRAN or SGT
10  BELTRAN.

11      30.     I also noted apparent discrepancies between the dispatch activity between
12  the BPD dispatch center and the WPD.

13      31.     The dispatch data from Spillman indicates that, in 2015, *no* dispatch
14  activity occurred during approximately 29 of the Stonegarden shifts.   Of those,
15  approximately 19 were shifts that CHIEF BELTRAN claimed he was working.   The
16  remaining approximately 10 shifts were shifts that SGT BELTRAN claimed he was
17  working.

18      32.     In 2016, Spillman indicates that there was *no* dispatch activity during
19  approximately 59 of the Stonegarden overtime shifts.   Of those, CHIEF BELTRAN
20  claimed to have worked approximately 29 Stonegarden shifts, and SGT BELTRAN
21  claimed to have worked approximately 29 Stonegarden shifts.   Of the approximately
22  29 Stonegarden shifts claimed by CHIEF BELTRAN, approximately 19 of the days
23  during which CHIEF BELTRAN claimed to have worked a Stonegarden shift had no
24  radio traffic the entire day and approximately 10 had no radio traffic during the
25  Stonegarden shift CHIEF BELTRAN claimed to have worked.   Of the approximately
26  29 Stonegarden shifts claimed by SGT BELTRAN, approximately 9 of the days during
27  which SGT BELTRAN claimed to have worked a Stonegarden shift had no radio traffic
28

the entire day and 20 had no radio traffic during the Stonegarden shift SGT BELTRAN claimed to have worked.

33.     From January 1 to March 31, 2017, Spillman indicates that there was *no* dispatch activity on approximately 10 of the Stonegarden overtime shifts.  Of those, CHIEF BELTRAN claimed to have worked approximately 3 Stonegarden shifts and SGT BELTRAN claimed to have worked approximately 7 Stonegarden shifts.  Of the approximately 3 Stonegarden shifts claimed by CHIEF BELTRAN, none of them had any radio traffic the entire day.  Of the approximately 7 Stonegarden shifts claimed by SGT BELTRAN, approximately 3 of the days during which SGT BELTRAN claimed to have worked a Stonegarden shift had no radio traffic the entire day and approximately 4 had no radio traffic during the Stonegarden shift SGT BELTRAN claimed to have worked.

## THE REMAINING SUBJECT MEDIA

34.     The **REMAINING SUBJECT MEDIA** are computers used by the WPD, between the time period of August 12, 2014, and June 30, 2017.  CHIEF BELTRAN and SGT BELTRAN had access to and, at various times, used the **REMAINING SUBJECT MEDIA**.  The **REMAINING SUBJECT MEDIA** was housed in an open area as the WPD did not have separate offices for different individuals and all WPD personnel worked in the same area.  (The WPD is a small police force in Imperial County that employs approximately 5 officers).

35.     **SUBJECT MEDIA 12** is the computer utilized by CHIEF BELTRAN at his desk.  Based upon my conversation with a current WPD employee, I understand that the computer on CHIEF BELTRAN's desk – **SUBJECT MEDIA 12** – was primarily used by CHIEF BELTRAN, but that SGT BELTRAN, and other WPD officers to a lesser extent, were also known to use **SUBJECT MEDIA 12**.  Additionally, as stated above, SGT BELTRAN was observed using CHIEF BELTRAN's computer on at least one occasion.

36. **SUBJECT MEDIA 11** and **14** were located within the same open area of the WPD. Based upon my conversation with the same current WPD employee, I understand that all the media located within the WPD's common office space was available to and used by any WPD officer. I understand that CHIEF BELTRAN and SGT BELTRAN used the **SUBJECT MEDIA** located in the common areas, although SGT BELTRAN often utilized **SUBJECT MEDIA 11** and **14**. Other officers who submitted requests for overtime reimbursement from Stonegarden also had access to and, at various times, used **SUBJECT MEDIA 11 and 14** located in the common areas.

37. Based on my training and experience, I believe the **REMAINING SUBJECT MEDIA** may contain documents and data reflecting or tending to reflect the theft of federal grant funds from Stonegarden between August 12, 2014, and June 30, 2017, specifically the information outlined in Attachment B. As stated above, responsive information has already been located on the **REMAINING SUBJECT MEDIA**.

38. Based on my training and experience, I am aware that individuals often memorialize their criminal activities electronically (knowingly and unknowingly). Here, that may include by, among other things, creating a user, login, and/or query history on the **REMAINING SUBJECT MEDIA** that is consistent or inconsistent with the hours or shifts allegedly worked or location data that may be consistent or inconsistent with the DARs submitted for Stonegarden overtime reimbursement. I am also aware that individuals often use their workplace computers, like the **REMAINING SUBJECT MEDIA**, to create timesheets, event and activity logs (like DARs), and other materials, including associated metadata, that may substantiate, establish, or tend to establish (or disprove) hours and shifts worked. Indeed, two of the WPD officers I interviewed told me that CHIEF BELTRAN and SGT BELTRAN used the **SUBJECT MEDIA** located in the common areas of the WPD as well as **SUBJECT MEDIA 12** to prepare the DARs that were submitted and to run Spillman queries. As

1 | stated above, DARs have already been found on the **REMAINING SUBJECT**
2 | **MEDIA**.

3 |     39.    Based on my training and experience, I also am aware that individuals
4 | often memorialize their criminal activities using Internet based communication
5 | services or applications. Such communications may be retained on the **REMAINING**
6 | **SUBJECT MEDIA**, unless permanently deleted.

7 |                **SEARCH PROTOCOL**

8 |     40.    With the approval of the court in signing this warrant, agents executing
9 | the follow-on search warrant will employ the following procedures regarding the
10 | forensic images of the **REMAINING SUBJECT MEDIA**:

11 |          Identification and Extraction of Relevant Data

12 |     a.    The data contained on the forensic images of the **REMAINING**
13 | **SUBJECT MEDIA** will be analyzed to identify and extract data subject to seizure
14 | pursuant to this warrant. Analysis of the data following the creation of the forensic
15 | image can be a highly technical process requiring specific expertise, equipment, and
16 | software. There are thousands of different hardware items and software programs, and
17 | different versions of the same programs, that can be commercially purchased, installed,
18 | and custom-configured on a user's computer system. Computers are easily customized
19 | by their users. Even apparently identical computers in an office or home environment
20 | can be different with respect to configuration, including permissions and access rights,
21 | passwords, data storage, and security. It is not unusual for a computer forensic
22 | examiner to have to obtain specialized hardware or software, and train with it, in order
23 | to view and analyze imaged data.

24 |     b.    Analyzing the contents of a computer or other electronic storage
25 | device, even without significant technical challenges, can be very challenging.
26 | Searching by keywords, for example, often yields many thousands of hits, each of
27 | which must be reviewed in its context by the examiner to determine whether the data
28 | is within the scope of the warrant. Merely finding a relevant hit does not end the review

process for several reasons. The computer may have stored metadata and other information about a relevant electronic record – e.g., who created it, when and how it was created or downloaded or copied, when it was last accessed, when it was last modified, when it was last printed, and when it was deleted. Keyword searches may also fail to discover relevant electronic records, depending on how the records were created, stored, or used. For example, keywords search text, but many common electronic mail, database, and spreadsheet applications do not store data as searchable text. Instead, the data is saved in a proprietary non-text format. Documents printed by the computer, even if the document was never saved to the hard drive, are recoverable by forensic programs because the printed document is stored as a graphic image. Graphic images, unlike text, are not subject to keyword searches. Similarly, faxes sent to the computer are stored as graphic images and not as text. In addition, a particular relevant piece of data does not exist in a vacuum. To determine who created, modified, copied, downloaded, transferred, communicated about, deleted, or printed the data requires a search of other events that occurred on the computer in the time periods surrounding activity regarding the relevant data. Information about which user had logged in, whether users share passwords, whether the computer was connected to other computers or networks, and whether the user accessed or used other programs or services in the time period surrounding events with the relevant data can help determine who was sitting at the keyboard.

c.     It is often difficult or impossible to determine the identity of the person using the computer when incriminating data has been created, modified, accessed, deleted, printed, copied, uploaded, or downloaded solely by reviewing the incriminating data. Computers generate substantial information about data and about users that generally is not visible to users. Computer-generated data, including registry information, computer logs, user profiles and passwords, web-browsing history, cookies and application and operating system metadata, often provides evidence of who was using the computer at a relevant time. In addition, evidence such as electronic

1   mail, chat sessions, photographs and videos, calendars and address books stored on the

2   computer may identify the user at a particular, relevant time. The manner in which the

3   user has structured and named files, run or accessed particular applications, and created

4   or accessed other, non-incriminating files or documents, may serve to identify a

5   particular user. For example, if an incriminating document is found on the computer

6   but attribution is an issue, other documents or files created around that same time may

7   provide circumstantial evidence of the identity of the user that created the incriminating

8   document.

9          d.     Analyzing data has become increasingly time-consuming as the

10  volume of data stored on a typical computer system and available storage devices has

11  become mind-boggling. For example, a single megabyte of storage space is roughly

12  equivalent to 500 double-spaced pages of text. A single gigabyte of storage space, or

13  1,000 megabytes, is roughly equivalent to 500,000 double-spaced pages of text.

14  Computer hard drives are now being sold for personal computers capable of storing up

15  to 4 terabytes (4,000 gigabytes) of data. And, this data may be stored in a variety of

16  formats or encrypted (several new commercially available operating systems provide

17  for automatic encryption of data upon shutdown of the computer). The sheer volume

18  of data also has extended the time that it takes to analyze data. Running keyword

19  searches takes longer and results in more hits that must be individually examined for

20  relevance. And, once reviewed, relevant data leads to new keywords and new avenues

21  for identifying data subject to seizure pursuant to the warrant.

22        e.     Based on the foregoing, identifying and extracting data subject to

23  seizure pursuant to this follow-on search warrant may require a range of data analysis

24  techniques, including hashing tools to identify data subject to seizure pursuant to this

25  warrant, and to exclude certain data from analysis, such as known operating system

26  and application files. The identification and extraction process, accordingly, may take

27  weeks or months. The personnel conducting the identification and extraction of data

28

1 will complete the analysis within one-hundred twenty (120) days from the date of
2 seizure pursuant to this warrant, absent further application to this court.

3    f.    All forensic analysis of the imaged data will employ search
4 protocols directed exclusively to the identification and extraction of data within the
5 scope of this follow-on search warrant.

### Genuine Risks of Destruction of Data

7    g.    Based upon my experience and training, and the experience and
8 training of other agents with whom I have communicated, electronically-stored data
9 can be deleted or modified by users possessing basic computer skills. However,
10 electronically-stored data can often be difficult to delete permanently without special
11 software and may be recovered using law enforcement techniques. In this case,
12 depending on the skills of the targets of the investigation, as well as their use of special
13 software, there may have been destruction of some evidence. Other data, such as login
14 or geographical location history, is unlikely to have been targeted for or able to be
15 readily deleted.

### Prior Attempts to Obtain Data

17    h.    As discussed above, I attempted to obtain this data directly from the
18 WPD in coordination with the Westmoreland City attorney in December 2017. At that
19 time, I met with Mitch Driskill, the city attorney for Westmoreland and Perry Monita,
20 current Chief of the WPD. From them, I obtained signed, written consent to image and
21 analyze the contents of all of the WPD's computers. I took custody of **SUBJECT**
22 **MEDIA 1** through **8**, leaving sufficient computers to allow for the continued operations
23 of the WPD and with the understanding that the remaining computers may be imaged
24 at a later date. DHS OIG Digital Forensics Analysis Unit (DFAU) imaged **SUBJECT**
25 **MEDIA 1** through **8**, and I returned **SUBJECT MEDIA 1** through **8** to the WPD. In
26 an abundance of caution, however, I also obtained the Prior Warrant, as discussed
27 above. I also previously obtained search warrants for the **SUBJECT MEDIA** on
28

1 | August 20, 2018, before a decision was made to add additional details to the Affidavit.
2 | **SUBJECT MEDIA 9** and **10** were imaged at that time.

3 | Procedures to Protect Third Party Privacy

4 |       i.     All forensic analysis of the imaged data will employ search
5 | protocols directed exclusively to the identification and extraction of data within the
6 | scope of this warrant. In the event that the personnel lawfully conducting the analysis
7 | identify information pertaining to crimes outside the scope of the warrant, such
8 | information will not be used except to obtain a new warrant authorizing a search for
9 | such information. In the event a new warrant is obtained, the government may make
10 | use the data seized in any lawful manner. Absent a new warrant, the personnel
11 | conducting the analysis may continue to search for and seize data only within the scope
12 | of this warrant.

13 | **CONCLUSION**

14 |     41.   Based on all of the facts and circumstances described above, I believe
15 | that probable cause exists to conclude that the forensic images of the **REMAINING**
16 | **SUBJECT MEDIA**, further described in Attachment A, contains evidence of false
17 | submissions for overtime reimbursement from Stonegarden by CHIEF BELTRAN
18 | and SGT BELTRAN, as well those not-yet identified. The forensic images of the
19 | **REMAINING SUBJECT MEDIA** likely contains information, specifically that
20 | described in Attachment B, which constitutes evidence of violations of Title 18,
21 | United States Code, Sections 641 (Theft of Public Money or Property), 287 (Making
22 | or Presenting a False, Fictitious, or Fraudulent Claim), 371 (Conspiracy to commit
23 | offense or to defraud the United States), 1001 (False Statements), 1341(Mail Fraud),
24 | and/or 1343 (Wire Fraud). I also believe that probable cause exists to believe that
25 | evidence of illegal activity committed by the CHIEF BELTRAN and SGT
26 | BELTRAN, and others continues to exist on the forensic images of the **REMAINING**
27 | **SUBJECT MEDIA**. Therefore, I respectfully request that the Court issue this
28 | follow-on search warrant.

- 18 -

1    I swear the foregoing is true and correct to the best of my knowledge and belief.

2

3

4                            ALEJANDRO ARROYAVE

5                            Special Agent
                             United States Department of Homeland Security,
6                            Office of the Inspector General

7

8    SUBSCRIBED AND SWORN TO ME BEFORE THIS _____ DAY OF AUGUST,
9    2019

10

11                           HON. RUTH BERMUDEZ MONTENEGRO
12                           United States Magistrate Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28